**Herbert J. GRIMSHAW, Plaintiff,**

v.

**SOUTH FLORIDA WATER MANAGEMENT DISTRICT, Defendant.**

**No. 00–9134–CIV.**

United States District Court, S.D. Florida.

Feb. 7, 2002.

Isidro Manuel Garcia, Maria Kate Boehringer, Garcia, Elkins & Carbonell, West Palm Beach, FL, for plaintiff.

James Edward Nutt, South Florida Water Management District, West Palm Beach, FL, for defendant.

## ORDER ON MOTION TO DISMISS, OR IN THE ALTERNATIVE, SUMMARY JUDGMENT

MIDDLEBROOKS, District Judge.

### I. INTRODUCTION

This is a case about federalism, governmental structure and control, and water. The issue presented is whether the South Florida Water Management District (the "District" or "SFWMD") is immune from suit in federal court by reason of the Eleventh Amendment to the United States Constitution. The Judges of this district have reached opposite conclusions concerning this issue.[1] Moreover, in an unpub-

---

1. SFWMD was determined to be a state agency in the following cases: *Nicholas G. Aumen, Ph.D. v. South Florida Water Management District,* Case No. 99–8928–Civ–Ryskamp (S.D.Fla. Mar. 28, 2000); *Miccosukee Tribe of Indians of Florida v. United States,* 980 F.Supp. 448 (S.D.Fla.1997); *Bensch v. Metropolitan Dade County,* 952 F.Supp. 790 (S.D.Fla.1996); *Indian Trials Water Control District v. South Florida Water Management District, et al.,* Case No. 96–8528–Civ–Ryskamp (S.D.Fla. Dec. 10, 1996). It was not accorded immunity in the following cases: *Miccosukee Tribe of Indians of Florida v. South Florida Water Management District et al.,* Case No. 98–6056–Civ–Ferguson, 1999 WL 33494862 (S.D.Fla. Sept. 30, 1999); *It Corporation v. South Florida Water Management District,* 97–8872–Civ–Highsmith (S.D.Fla. July 20, 1998); *see also Thomas v. South Florida Water Management District,* Case No 96–896–Civ–Fawsett (M.D.Fla. March 23, 1998).

lished opinion, the Eleventh Circuit found it unnecessary to decide the dispute, commenting that whether the District should be considered an arm of the state or a political subdivision is a close question. *Miccosukee Tribe of Indians v. United States,* 163 F.3d 1359 (11th Cir.1998)(unpublished), *cert. denied* 528 U.S. 810, 120 S.Ct. 41, 145 L.Ed.2d 37 (1999); *see also Miccosukee Tribe of Indians of Florida v. Florida State Athletic Comm'n,* 226 F.3d 1226, 1233, n. 9 (11th Cir.2000). In this case, however, the issue is presented squarely and I am mindful of the admonition that Eleventh Amendment immunity is a threshold issue in the nature of a jurisdictional bar. *See Bouchard Transportation Co. v. Florida Dep't of Environmental Protection,* 91 F.3d 1445, 1448 (11th Cir.1996).

I therefore requested the parties to fully develop the record on this issue, permitted testimony, and was provided the benefit of legal memoranda and oral argument. After review, I conclude that the South Florida Water Management District should be considered an arm of the State for the purposes of the Eleventh Amendment.

## II. BACKGROUND

A. *South Florida Water Management District*

Florida is divided into five water management districts established by Chapter 72–299, Laws of Florida, the Florida Water Resources Act of 1972. Legislative authority for the districts is found in Chapter 373 Florida Statutes. The South Florida Water Management District's mission is to manage and protect the water resources within its boundaries by improving water quality, flood control, natural systems, and water supply within the region. The District's jurisdiction contains two primary hydrologic basins: the Okeechobee basin and the Big Cypress Basin.[2] The Okeechobee basin is based on the Kissimmee–Okeechobee–Everglades (KOE) ecosystem which stretches from Central Florida's Chain of Lakes to Lake Okeechobee, and south to the Florida Keys. It includes the southeast coast, the Everglades Agricultural Area and the Everglades National Park. The Big Cypress Basin includes Collier county in the south west part of Florida, a part of Monroe county, the Big Cypress National Preserves and the 10,000 Islands. The District includes a population of approximately 6 million people, encompasses all or part of 16 counties in total and covers an area of 17,930 square miles.[3]

---

**2.** The water management districts were drawn according to hydrologic features to mirror water flows which do not follow traditional political boundaries. For example, the flow of the water to the Everglades has been described as follows:

> It is poured into Lake Okeechobee from north and west, from the fine chain of lakes which scatter up and down the center of Florida, like bright beads from a string. They overflow southward. The water is gathered from the northwest through a wide area of open savannas and prairies. It swells the greatest contributing streams, the Kissimmee River, and the Taylor River and Fisheating Creek, and dozens of other smaller named and unnamed creeks or rivulets, and through them moves down into the great lake's tideless blue-misted expanse.
> The water comes from the rains. The northern lakes and streams, Okeechobee itself, are only channels and reservoirs and conduits for a surface flow of rain water, fresh from the clouds. A few springs may feed them, but no melting snow water, no mountain freshets, no upgushing from caverns in ancient rock. Here the rain is everything.

MARJORY STONEMAN DOUGLAS, THE EVERGLADES: RIVER OF GRASS 14, (Pineapple Press, Inc. 1997).
For a map of the District see http://www.sfwmd.gov/histo/3_counties.html.

**3.** Florida faces major water management challenges driven in part by a population that is projected to increase from nearly 16 million

The South Florida Water Management District is governed by a nine member board, appointed by the Governor, subject to confirmation by the Florida Senate. Pursuant to Section 373 of the Florida Statutes, SFWMD has substantial fiscal and regulatory authority, and for the current fiscal year its budget is $728.6 million. The funds are comprised of local property taxes, levied pursuant to the District's ad valorem taxing power, monies paid for licenses, permits and fees, general revenue appropriated by the legislature and federal funds.

The District has a self-insurance fund which it uses to pay worker's compensation, automobile liability and general liability claims and judgments. The District determines the fund amount based upon its loss experience. The current balance of the self-insurance fund is $6,259,508. It is estimated that 80 percent of that fund is currently comprised of revenue from ad valorem taxation.

### B. *Procedural History*

This action was filed pursuant to the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.* Plaintiff, Dr. Herbert Grimshaw, II, is currently employed as a Senior Environmental Scientist in SFWMD's Okeechobee Division. (Complaint at ¶ 5). Plaintiff asserts that he was subjected to a number of adverse employment actions by the Defendant due to his age (Plaintiff is over 40 years old), including being placed on probation and being terminated. (Complaint at ¶ 15). The District terminated Dr. Grimshaw in

July of 1998. (Complaint at ¶ 23). The Plaintiff was then rehired on June 8, 1999. (Complaint at ¶ 24). Plaintiff filed this two count action on December 22, 2000. Count I charges SFWMD with age discrimination in violation of the ADEA and Count II alleges retaliation. Plaintiff asserts that his termination was based on his age and that the Defendant retaliated against him for filing a grievance of discrimination following his return to SFWMD. The Defendant has filed a motion to dismiss or in the alternative for summary judgment asserting Eleventh Amendment Immunity. A hearing was held on January 29, 2002.

### III. STANDARD OF REVIEW

A motion to dismiss is appropriate only when it is demonstrated "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). For the purpose of the motion to dismiss, the Complaint is construed in the light most favorable to the plaintiff, and all facts alleged by the plaintiff are accepted as true. *See Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). Regardless of the alleged facts, however, a court may dismiss a Complaint upon a finding in favor of the moving party on a dispositive issue of law. *See Marshall County Bd. of Educ. v. Marshall County Gas Dist.,* 992 F.2d 1171, 1174 (11th Cir.1993).

■ Summary judgment is appropriate only when there are no genuine issues of

in fresh water use from about 7.2 billion gallons a day in 1995 to about 9.3 billion gallons a day in 2020; (2) pollution from existing and ongoing development is impairing the quality of surface waters; (3) nitrate contamination threatens many of the major spring systems; (4) contaminated development in high-risk low-lying areas is increasing the potential for flooding; (5) water within the year 2000 to about 20.7 million by 2020.

These include: (1) a projected increase drawals to meet human needs are causing harm to natural systems; and (6) the most severe drought in recorded history is causing water shortages in many parts of the State. *See* December 2001 Water Plan, Department of Environmental Protection, State of Florida at http://w ww.dep.state.fl.us/water/waterpolicy/index.htm.

material fact and the movant is entitled to judgment as a matter of law. *See* FED. R.CIV.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party bears the burden of meeting this exacting standard. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). In applying this standard, the evidence, and all reasonable factual inferences drawn therefrom, must be viewed in the light most favorable to the non-moving party. *See Arrington v. Cobb County,* 139 F.3d 865, 871 (11th Cir.1998); *Allen v. Tyson Foods, Inc.,* 121 F.3d 642, 646 (11th Cir.1997). The issue presented in this matter is a dispositive issue of law. Under either analysis, a finding that SFWMD is entitled to immunity would require the Court to dismiss this action.[4]

## IV. DISCUSSION

The Eleventh Amendment to the United States Constitution provides:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another State, or by Citizens or Subjects of any Foreign State. U.S. CONST. amend XI.

Although the express language of the Amendment encompasses only suits brought against a state by citizens of another state, the Supreme Court has held that it also prohibits suits against a state by its own citizens. *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996); *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890); *see also Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy,* 506 U.S. 139, 146, 113 S.Ct. 684, 689,

121 L.Ed.2d 605 (1993) ("The Amendment is rooted in a recognition that the States, although a union, maintain certain attributes of sovereignty, including sovereign immunity."). "The Eleventh Amendment largely shields States from suit in federal courts without their consent, leaving parties with claims against a State to present them, if the State permits, in the State's own tribunals." *Hess v. Port Authority Trans–Hudson Corporation,* 513 U.S. 30, 39, 115 S.Ct. 394, 400, 130 L.Ed.2d 245 (1994).

The Amendment's bar against suits in federal courts extends to the state and its instrumentalities, but it does not extend to counties, municipal corporations, or other political subdivisions of the state. *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 280, 97 S.Ct. 568, 572, 50 L.Ed.2d 471 (1977). In deciding whether a state instrumentality may invoke the state's immunity, the inquiry focuses on the nature of the entity created by state law in order to determine whether it should be treated as an arm of the state. *Regents of the University of California v. Doe,* 519 U.S. 425, 429, 117 S.Ct. 900, 904, 137 L.Ed.2d 55 (1997). Ultimately, the question of whether a particular agency has the same kind of independent status as a county or instead is an arm of the State and therefore "one of the United States" within the meaning of the Eleventh Amendment is a question of federal law. However, that federal question can be answered only after considering the provisions of state law that define the agency's character. *Id.* at n. 5.

In determining whether the Eleventh Amendment provides immunity to a particular entity, the Eleventh Circuit examines the following factors: (1) how the

---

4. Florida's Eleventh Amendment immunity has not been waived or abrogated by the Age Discrimination in Employment Act. *See Kimel v. Florida Board of Regents,* 528 U.S. 62, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000) (holding that the ADEA did not validly abrogate the state's Eleventh Amendment immunity from suits by private individuals).

state law defines the entity; (2) what degree of control the state maintains over the entity; (3) where the entity derives its funds from; and (4) who is responsible for judgments against the entity. *See Miccosukee Tribe of Indians of Florida v. Florida State Athletic Comm'n*, 226 F.3d 1226, 1231; *Stewart v. Baldwin County Bd. of Educ.*, 908 F.2d 1499, 1509 (11th Cir.1990); *Tuveson v. Florida Governor's Council on Indian Affairs, Inc.*, 734 F.2d 730, 732 (11th Cir.1984).

### A. Definition of SFWMD under State Law

■ Article II, section 7 of the Florida Constitution states "[i]t shall be the policy of the state to conserve and protect its natural resources and scenic beauty. Adequate provision shall be made by law for the abatement of air and water pollution and of excessive and unnecessary noise." This provision has been described by the Florida Supreme Court as a statement of policy and a mandate to the Florida Legislature. *See Askew v. Cross Key Waterways*, 372 So.2d 913, 914 (Fla.1978). Pursuant to this direction, which was adopted as part of the 1968 revision to the Constitution, the Florida Legislature enacted the Florida Water Resources Act, Chapter 72–299, Laws of Florida, which established Florida's water management framework.

In Section 373 of the Florida Statutes, the Florida Legislature has made the following findings and policy declaration:

> The waters in the state are among its basic resources. Such waters have not heretofore been conserved or fully controlled to realize their full beneficial use.
>
> \* \* \* \* \* \*
>
> Because water constitutes a public resource benefitting the entire state, it is the policy of the Legislature that the waters in the state be managed on a state and regional basis.
>
> \* \* \* \* \* \*

The Legislature recognizes that the water resources problems of the state vary from region to region, both in magnitude and complexity. It is therefore the intent of the legislature to vest in the Department of Environmental Protection or its successor agency the power and responsibility to accomplish the conservation, protection, management and control of the waters of the state with sufficient flexibility and discretion to accomplish these ends through delegation of appropriate powers to the various water management districts. The department may exercise any power herein authorized to be exercised by a water management district; however, to the greatest extent practicable such power should be delegated to the governing board of a water management district.

FLA. STAT. § 373.016

> \* \* \* \* \* \*
>
> It is the finding of the legislature that the general regulatory and administrative functions of the districts herein authorized are of general benefit to the people of the state and should substantially be financed by general appropriations. Further, it is the finding of the legislature that water resources programs of particular benefit to limited segments of the population should be financed by those most directly benefitted. To those ends, this act provides for the establishment of permit application fees and a method of ad valorem taxation to finance the works of the district.

1972 Fla. Laws ch. 299, part V, § 1(1).

> \* \* \* \* \* \*
>
> It is further declared the policy of the Legislature that each water management district, to the extent consistent with effective management practices, shall approximate its fiscal and budget policies and procedures to those of the state.

**1364**

Through these provisions, the Legislature defines the water management districts as operating under state control to perform a state function with a regional component.

The unusual structure and taxing power of the water management districts quickly sparked litigation. In *St. Johns River Water Management District v. Deseret Ranches of Florida Inc.*, 421 So.2d 1067 (Fla.1982), the Florida Supreme Court considered a challenge to the constitutionality of the establishment of a River Basin ancillary to a Water Management District as well as the taxing power of the districts. While the peculiarities of Florida law giving rise to the case are not necessary to the issue here, the gravamen of the dispute was whether the laws enacting the districts were directed to "entities, interests, rights, and functions *other than those of the State.*" *Id.* at 1069. The Florida Supreme Court held that the "statewide water management plan created and implemented by Chapter 373 is primarily a state function serving the state's interest in protecting and managing a vital natural resource." *Id.*

The Florida Supreme Court also rejected the challenge to the ad valorem taxing power of the districts. It was argued that if the district served a state function then its ad valorem taxing power violated Article VII, section 1(a), of the Florida Constitution which prohibits State ad valorem taxes. The Court agreed that "[t]he fact that water resource conservation, control, planning and development are state functions does not make them exclusively, so ... It is clear that simply because a water

management district furthers a state function, policy, or purpose does not prevent it from levying ad valorem taxes where the local function, policy, or purpose is similarly vital to the local district area." *Id.* at 1070–71, *quoting Deseret Ranches of Florida, Inc. v. St. Johns River Water Mgmt. District,* 406 So.2d 1132, 1140 (Fla. 5th DCA 1981).

Other than the Supreme Court's holding that the Districts serve a "state function," Florida courts have shown some inconsistency in describing the SFWMD.[5] For example, in *Florida Sugar Cane League, Inc. v. South Florida Water Mgmt. District,* 617 So.2d 1065, 1066 (Fla. 4th DCA 1993), the Fourth District Court of Appeals described SFWMD as a "regulatory state agency" subject to the provisions of the Florida Administrative Procedure Act, Chapter 120, Florida Statutes. However, in *Martinez v. South Florida Water Management District,* 705 So.2d 611, 612 (Fla. 4th DCA 1997), that same Court pointed to the "amorphous" nature of the District and found it not to be a State agency for purposes of the Drug Free Workplace Act, Section 112.0455, Florida Statutes.

In arguing that SFWMD should be treated as a political subdivision like a county or city rather than as an instrumentality or arm of the state, the Plaintiff places great weight upon the Florida Supreme Court's decision in *Canaveral Port Authority v. Dep't of Revenue,* 690 So.2d 1226 (Fla.1996). The issue in that case was whether Brevard County could assess ad valorem taxes on property owned by the Canaveral Port Authority and leased to private entities engaged in non-governmental activities.

---

**5.** In *United States v. Southern Florida Water Mgmt. District,* 28 F.3d 1563 (11th Cir.1994), *cert. denied sub nom. Western Palm Beach County Farm Bureau, Inc. v. United States,* 514 U.S. 1107, 115 S.Ct. 1956, 131 L.Ed.2d 848 (1995) the Eleventh Circuit described the

SFWMD and the Department of Environmental Regulation as "two state agencies." However, in the context used, the Court may have simply been contrasting state as opposed to federal agencies.

The Florida Supreme Court determined that

> [O]nly the State and those entities which are expressly recognized in the Florida Constitution as performing a function of the state comprise 'the state' for purposes of immunity from ad valorem taxation. What comprises 'the state' is thus limited to counties, entities providing the public system of education, and agencies, departments, or branches of state government that perform the administration of the state government.

*Id.* at 1228.

The Court held that the Canaveral Port Authority was not such an entity and therefore not immune from ad valorem taxation.

For several reasons, I do not consider this case dispositive or even helpful to the Eleventh Amendment analysis. First, in defining "the State" for purposes of immunity from ad valorem taxation, the Florida Supreme Court includes political subdivisions such as counties, cities, and school boards which are not entitled to Eleventh Amendment immunity. Eleventh Amendment immunity and ad valorem taxation immunity are different concepts serving different purposes with different analytical frameworks.

Moreover, despite some expansive language in the dissent about a variety of special districts, the majority opinion in *Canaveral* did not decide the issue of the SFWMD's immunity from ad valorem taxation. As noted above, in *Deseret Ranches,* the Florida Supreme Court determined that the water management districts serve a state function. The Florida Constitution also identifies the South Florida Water Management District, or its successor agency as responsible for administering the Everglades Trust Fund, a State trust fund established by constitutional amendment in 1996 and therefore it may fall within *Canaveral Port Authority's* definition of the state. Finally, *Canaveral* did not reference, and presumably left undisturbed, an earlier decision that water management districts are immune from ad valorem taxation. *Andrews v. Pal–Mar Water Control Dist. Dep't of Revenue,* 388 So.2d 4 (Fla. 4th DCA 1980).[6]

In examining how SFWMD is characterized under state law, I also find significant the manner in which its finances are reported. Under the generally accepted accounting principles promulgated by the Government Accounting Standards Board and as implemented by the Comptroller of Florida, the District is treated as a "component unit" of the State government which is considered the primary government. The District's finances are therefore reported as part of the state's financial statements.[7] The District's financial

---

6. The differences between the Canaveral Port Authority and SFWMD for purposes of Eleventh Amendment analysis are apparent. The Port Authority is governed by elected port commissioners. The Legislature also directed that the Authority could be sued in a district court of the United States. *See* 1953 Fla. Laws ch. 28922, art III.

7. According to the testimony of Aaron Bassinger, the Budget Director of the District, a primary government must meet three specific criteria: (1) it must be a legally separate entity; (2) it must be fiscally independent; and (3) its governing body must be elected. Examples of primary government include the state, a city, a county, a school board. A component unit must also meet specific criteria: (1) it must be legally separate; (2) it must be fiscally dependent on the primary government; and (3) its governing board must not be elected but appointed by the primary government. *See also* MILLER GOVERNMENTAL GAAP GUIDE ch. 4 (2000) *quoting* GASB 14, par. 20 ("The nature and the significance of the relationship between the [component unit] and a primary government are such that to exclude the entity from the financial reporting

reports are required to contain a notation that it is a component unit of the State of Florida.

### B.  Degree of State Control

The degree of control the state exercises over SFWMD is pervasive and substantial. The Governor, subject to confirmation by the Florida Senate, appoints the members of the District's governing board. FLA. STAT. § 373.073. The Governor has the authority to remove from office any officer of a water management district. FLA. STAT. § 373.076(2). The appointment of the executive director is subject to approval by the Senate. FLA. STAT. § 373.079(4)(a).

The Governor and the Cabinet, sit as the Florida Land and Water Adjudicatory Commission (the "Commission"). The Commission has authority to review any order or rule of the District. If they determine such order or rule to be inconsistent with chapter 373, Florida Statutes, they can require the District to initiate rulemaking proceedings to amend or repeal the challenged order or rule. FLA. STAT. § 373.114.

The Governor is authorized to approve or disapprove, in whole or in part, the budget of each water management district and to analyze each budget as to the adequacy of fiscal resources available to the District and the adequacy of the District expenditures. FLA. STAT. § 373.536(5)(a). Any provision rejected by the Governor shall not be included in a district's financial budget. FLA. STAT. § 373.536.

The District's budget director testified that in practice, the Governor's control of the district's finances extends to every aspect of the district's operation from questions and required justifications on major restoration projects, to computer equipment, travel, training, number of employees, salary and merit increases. The Governor's review has even extended to such minuscule matters as objections concerning the expense of watering plants at the District's headquarters and the coffee and donuts served at District meetings. According to the budget director, the Governor has also directed major reprioritizations of district expenditures by issuing a directive that an additional $10.7 million be allocated within the District's budget to the Comprehensive Everglades Restoration Plan with the resulting budgetary shortfalls rippling across every program that the District undertakes.

The Eleventh Circuit has stated that where the budget of an entity is submitted to the state for approval, it is presumed for the purposes of evaluating the degree of state control and the entity's fiscal autonomy, that the entity is an agency of the state. *Stewart v. Baldwin County Bd. of Educ.*, 908 F.2d at 1509; *Harden v. Adams*, 760 F.2d 1158, 1163 (11th Cir. 1985), *cert. denied* 474 U.S. 1007, 106 S.Ct. 530, 88 L.Ed.2d 462; *Fouche v. Jekyll Island–State Park Auth.*, 713 F.2d 1518, 1520 (11th Cir.1983). The degree of state control exercised over SFWMD is very compelling.

### C.  Where Funds are Derived

The various water management districts receive funding from a variety of sources including general appropriations from the state. According to the testimony of Sandra Howard, a government analyst with the Department of Environmental Protection ("DEP") and formerly with the Office of the Governor, the overall budget for the five water management districts is approximately $2 billion annually. While it varies

---

entity [i.e. the primary government] would render the financial statements misleading or incomplete.").

from year to year because of large acquisitions, state funding is between 20 to 30 percent of that annual amount.

The state provides monies through general appropriations for general operations of the districts, for special projects and specific purposes through the budget of the Department of Environmental Protection, and funding for unexpected expenses. As an example, Ms. Howard testified that during the past year the South Florida Water Management District lacked sufficient funding to deal with a severe drought and obtained additional funds in mid budget year from DEP.

The water management districts also have the ability to raise revenues through ad valorem taxes. The overall ceiling for such taxes applicable to the South Florida Water Management District is set in the Florida Constitution as 1.0 mill. FLA. CONST. art. VII, § 9. The Florida Legislature has authorized SFWMD to levy taxes for purposes of Chapter 373, Florida Statutes, up to a total millage rate of .8 mill, an amount less than the constitutional cap. FLA. STAT. § 373.503(3)(a)5. Presently, SFWMD assesses at .697 mills. According to the District's budget director, the District has requested tax increases since 1998 but has been denied such increases by the Governor.

As noted previously, the current annual budget for SFWMD is $728.6 million. Of that amount, approximately 35 to 45 percent comes from ad valorem taxes; 20 to 30 percent comes from state funding; federal funding approximates another 10 to 15 percent, with permit revenues and fees accounting for the remainder. The proportion between these funding sources varies from year to year based upon what major projects the District undertakes. For example, at present the District has embarked on the Comprehensive Everglades Restoration Plan ("CERP"), a massive restructuring of South Florida's existing flood control network. The projected cost of the program is $8.2 billion with costs split equally between the state and federal government. To finance CERP, the Florida Legislature established the Everglades Trust Fund, administered by SFWMD. Funds deposited into the Trust Fund include: (1) toll revenues; (2) an Everglades agricultural privilege tax; (3) a C–139 agricultural privilege tax; (4) special assessments; (5) ad valorem revenues; (6) federal funding; (7) Preservation 2000 funds; (8) additional funds appropriated by the Legislature for Everglades restoration; (9) gifts; and (10) any additional funds which become available. FLA. STAT. § 373.45926(4). The variety of funding reflects the magnitude of the project and its importance to the state.[8]

D. *Responsibility for Judgments*

As noted above, the District is self-insured. Based upon its claims history, an amount is budgeted to its self-insurance fund. Currently, that amount is approximately $6 million. Since the fund is primarily used for worker's compensation

---

8. The Everglades have special significance to Floridians:

There are no other Everglades in the world. They are, they have always been, one of the unique regions of the earth, remote, never wholly known. Nothing anywhere else is like them: their vast glittering openness, wider than the enormous visible round of the horizon, the racing free saltness and sweetness of their massive winds, under the dazzling blue heights of space. They are unique also in the simplicity, the diversity, the related harmony of the forms of life they enclose. The miracle of the light pours over the green and brown expanse of saw grass and of water, shining and slowmoving below, the grass and water that is the meaning and the central fact of the Everglades of Florida. It is a river of grass. MARJORY STONEMAN DOUGLAS, THE EVERGLADES: RIVER OF GRASS 5–6.

claims and because most of the District's employees are funded from ad valorem sources, approximately 80% of the fund is supported by ad valorem resources. The self-insurance fund, like all other budget items of the District goes through the state budget process.

To the District budget director's knowledge, the self-insurance fund has never been depleted. He also does not recall any instance where the District has been required to seek assistance from the state in connection with an employment related claim or judgment; however, there has been an instance where state trust funds were used to pay a judgment of approximately $40 million in connection with land acquisition.

The Plaintiff argues that in order to be accorded Eleventh Amendment immunity, any judgment against the SFWMD *must* be paid out of the state treasury. The Plaintiff contends that function and control are irrelevant considerations, that the only determinative factor is whether sufficient funds are available from sources other than the state to pay any likely judgment in this case.

In arguing that function and control are irrelevant and that the single dispositive issue is whether the judgment must be paid from the state treasury, the Plaintiff relies upon what I believe to be a strained interpretation of the Supreme Court's decision in *Hess v. Port Authority Trans–Hudson Corp., supra.*[9] I do not believe that the facts and holding of *Hess* support the plaintiff's construction. Significantly,

the Eleventh Circuit has continued to rely upon its four factor test after *Hess. See e.g. Miccosukee Tribe v. Florida State Athletic Comm'n,* 226 F.3d at 1231; *Shands Teaching Hospital and Clinics, Inc. v. Beech Street Corp.,* 208 F.3d 1308 (11th Cir.2000). Moreover, since *Hess,* the Supreme Court has emphasized the necessity for an examination of the nature of the entity created by state law to determine whether it should be treated as an arm of the state instead of "convert[ing] the inquiry into a formalistic question of ultimate financial liability." *Regents of the Univ. of California v. Doe,* 519 U.S. at 430, 117 S.Ct. at 904.

The facts of *Hess* are also markedly different from those presented here. The Port Authority in *Hess* was established through a bistate compact between New York and New Jersey and was conceived as a financially independent entity with funds primarily derived from private investors. Debts of the authority were not obligations of either founding states and the states did not appropriate funds to the authority. The Port Authority's compact and implementing legislation barred it from drawing on state tax revenue and imposing any charges on either state although the legislation provided for up to $100,000 from each state to cover certain administrative expenses upon advance approval of the governors of both states and appropriation by their legislatures. The Supreme Court noted that the authority had received no money from New York or New Jersey since 1934, because revenues

---

**9.** The Plaintiff also cites to the Eleventh Circuit's decision in *Travelers Indemnity Co. v. School Bd. of Dade County,* 666 F.2d 505 (11th Cir.1982), *cert. denied,* 459 U.S. 834, 103 S.Ct. 77, 74 L.Ed.2d 74, but quotes a portion of the opinion out of context and misstates its holding (Plaintiff's Response, p. 17). The question before that Court there was whether a subordinate political entity not normally a part of the state for Eleventh

Amendment purposes, i.e. a school board, nonetheless obtained protection if the suit against it arose from a contract for which the state provided funds. 666 F.2d at 507. As the subsequent decision in *Shands Teaching Hospital and Clinics, Inc.* demonstrates, *Traveler's* did not establish a requirement that monies must be paid directly by the state treasury in order to qualify for Eleventh Amendment immunity. 208 F.3d 1308.

from the authority's operations cover all expenses.

Contrary to plaintiff's assertion, the Supreme Court did not consider function or control irrelevant but analyzed those factors and found them, as applied to the Port Authority, to be pointing in differing directions. The Court found that although the state courts had referred to the Port Authority as an agency of the states, the legislation did not so describe it, and that its functions were not readily classified. *Hess,* 513 U.S. at 44–45, 115 S.Ct. at 403. The court also noted that while each state could exert significant authority, no state alone could direct its activities. "Gauging actual control, particularly when an entity has multiple creator-controllers, can be a 'perilous inquiry.'" 513 U.S. at 47, 115 S.Ct. at 404 (citations omitted). The Court placed substantial weight on a third factor—the Port Authority's anticipated and actual financial independence and its long history of paying its own way.[10]

The Port Authority maintained that its private funding and financial independence created a different impact upon New York and New Jersey which should be considered. Operating profitably, the Port Authority dedicates some of its surplus to public projects the states would otherwise be required to undertake such as bus services. A judgment against it therefore would, by reducing the surplus available for such purposes, affect the treasuries of the two states.

The Court rejected this argument:

The proper focus is not on the use of profits or surplus, but rather is on losses and debts. If the expenditures of the enterprise exceed receipts, is the State in fact obligated to bear and pay the resulting indebtedness of the enterprise? When the answer is "No" both legally and practically—then the Eleventh Amendment's core concern is not implicated.

*Hess,* 513 U.S. at 51, 115 S.Ct. at 406.

The facts here are different. There are not multiple sovereigns, only one. No profits are realized, instead a substantial portion of the District's revenues come from the state and all expenditures are controlled by the state. The state has in the past participated in paying a judgment against the District. If expenditures exceed receipts, either the state must approve the elimination of programs or services, allow the District to raise additional ad valorem funds within the cap authorized by the Constitution, or expend additional money from the state treasury.

SFWMD operates under state law pursuant to a constitutional mandate and it performs a state function. The state exercises virtually absolute control over its personnel, budget, policies and operations. A substantial portion of its funds comes from the state and the state exercises budget item control over all of its resources. SFWMD was not conceived of as an independently financed agency; the Florida Legislature found that the districts "should be substantially financed by general appropriations." 1972 Fla. Laws ch. 299, part V, § 1(1). While a judgment is legally enforceable against the District, as a practical matter the state's treasury is directly implicated both through the budget process and by the reality that the

---

**10.** The Court contrasted the Port Authority facts with those in *Morris v. Washington Metro. Area Transit Authority,* 781 F.2d 218 (D.C.Cir.1986), a decision it found "compatible with our approach." "[W]here an agency is so structured that as a practical matter, if the agency is to survive, a judgment must expend itself against state treasuries, common sense and the rationale of the eleventh amendment require that sovereign immunity attach to the agency." *Hess,* 513 U.S. at 50, 115 S.Ct. at 405, n. 20 (*quoting Morris,* 781 F.2d at 227).

state in order to execute its water management function and plan for the future must maintain the financial viability of the District.

Current Eleventh Amendment jurisprudence emphasizes the integrity retained by each state in the federal system. The Amendment operates to protect a state's autonomy, its ability to set its own agenda, to control its own internal machinery, and to plan for the future. To many, Florida is known as the Sunshine State. But to those who live along its rivers, springs, and lakes, enjoy its shorelines and river of grass, and rely upon its waters to drink and water crops, Florida's existence seems more fragile than the expectation that the sun will rise each morning.[11] The water management districts work to further the state's critical objective of preserving its water supply.

■■ While the facts of this case fit within the confines of the majority opinion in *Hess*, the structure of the water management district also demonstrates the wisdom of Justice O'Connor's dissenting opinion on behalf of four members of the Court. Florida has sought to combine state direction and control with regional flexibility based upon hydrologic boundaries. That innovation should be respected by the courts. An arm of the State is an entity that undertakes state functions and is politically accountable to the state. *Hess*, 513 U.S. at 61, 115 S.Ct. at 411 (O'Connor, J. dissenting). The lines of oversight by the state of SFWMD are clear and substantial.[12] In this case each Eleventh Amendment test—the four factors of the Eleventh Circuit, the emphasis on the state treasury of the *Hess* majority, and the control-centered formulation of Justice O'Connor—lead to the same con-

---

11. The DEP's 2000 Status Report on Regional Supply Planning states:

> Many of our natural systems are highly dependent on water: they require specific amounts of water for a particular length of time during the right season of the year. In South Florida, water is needed to support the Everglades; in Central and North Florida, groundwater is needed to support the flow of 600 springs; in North Florida, water is needed to maintain base flows in major river systems including the Apalachicola, Suwannee, and St. Johns. Along the entire coastline, adequate fresh water flows are needed to maintain the proper salinity in our estuaries, which support diverse wildlife habitats and valuable sport and commercial fisheries. These extraordinary natural features have attracted people to this state, and sustaining them while ensuring adequate water supply, is a fundamental challenge for water management.

The Report is available at http://www.dep.state.fl.us/water/waterpolicy/index.htm.

12. Perhaps nothing demonstrates the control by the State over SFWMD more dramatically than the settlement of the Everglades litigation brought by the federal government. On

May 21, 1991, Florida Governor Lawton Chiles walked into the federal courthouse in Miami and stated:

> I came here today convinced that continuing the litigation does not solve the problem to restore the Everglades. I am more than ever convinced of that ... We talked about water in the glass ... I am ready to stipulate today that the water is dirty. I think that [what this is] about Your Honor ... is how do we get clean water? What is the fastest way to do that? I am here and I brought my sword. I want to find out who I can give that sword and I want to be able to give that sword and have our troops start the reparation, the clean up ... We want to surrender. We want to plead that the water is dirty. We want the water to be clean, and the question is how we can get it the quickest.

Transcript of Hearing Proceedings, May 21, 1991, in *United States v. South Fla. Water Mgmt. Dist.*, No. 92–4314 (S.D. Fla. filed 1988), available at *http://exchange.law.miami.edu/everglades*.

The Governor showed up with his sword after changing SFWMD's chairman, the composition of its board, its executive director, and firing its outside counsel.

clusion. In order to obtain the vindication of state sovereignty protected by the Amendment, the South Florida Water Management District should be deemed an arm of the state.

## V. CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss, or in the alternative, for Summary Judgment is GRANTED. This action is dismissed by reason of the Eleventh Amendment. The action must be brought, if permitted, in the courts maintained by the State of Florida.

DONE AND ORDERED in Chambers at West Palm Beach, Florida this ___ day of February, 2002.