[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-16082
_____

D.C. Docket No. 9:10-cv-81017-JIC

UNITED STATES OF AMERICA,
*Ex rel.*
MICHAEL LESINSKI,

Plaintiff - Appellant,

versus

SOUTH FLORIDA WATER
MANAGEMENT DISTRICT,

Defendant - Appellee.
_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(January 2, 2014)

Before CARNES, Chief Judge, WILSON, Circuit Judge, and DALTON,[*] District Judge.

DALTON, District Judge:

_____

[*] Honorable Roy B. Dalton, Jr., United States District Judge for the Middle District of Florida, sitting by designation.

In 1863, Congress enacted the False Claims Act ("FCA"), 31 U.S.C. §§ 3729–3733, in response to the massive frauds perpetrated upon the U.S. Government by private contractors during the Civil War. *See Vt. Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 781, 120 S. Ct. 1858, 1867 (2000). The FCA is designed to protect the Government from fraud by imposing civil liability and penalties upon those who seek federal funds under false pretenses. Significantly, to enforce the FCA, the Government relies in part upon private citizens, whom it empowers to bring suit on its behalf by acting as relators in *qui tam* actions. A statutory limitation that parallels the scope of the Eleventh Amendment precludes *qui tam* relators from bringing suit to redress fraud perpetrated upon the federal government if the alleged fraudster is a sovereign state. *See* 31 U.S.C. § 3729(a); *Stevens*, 529 U.S. at 787–88, 120 S. Ct. at 1870–71 (holding that the term "person," as used in the FCA, does not include States or state agencies for purposes of *qui tam* liability).

This FCA action, brought by a *qui tam* relator against a state instrumentality, presents a question familiar to federal district courts in Florida[1]: is the South Florida Water Management District an arm of the State of Florida such that a suit

---

[1] U.S. district courts have addressed the question of whether Florida's water management districts constitute an arm of the State of Florida at least thirteen times. *See, e.g.*, *Grimshaw v. So. Fla. Water Mgmt. Dist.*, 195 F. Supp. 2d 1358 (S.D. Fla. 2002); *Miccosukee Tribe of Indians of Fla. v. United States*, 980 F. Supp. 448 (S.D. Fla. 1997).

against it amounts to a suit against the State itself? For the reasons discussed below, we hold that it is and therefore cannot be sued by an FCA *qui tam* relator.

## I[2]

In 2004 and 2005, a barrage of hurricanes struck the southern coast of Florida, damaging the region's flood control works. In response, the South Florida Water Management District ("District"), a state instrumentality tasked with maintaining the area's canals and levees, set about making repairs. To offset the substantial repair costs, the District solicited reimbursements from the Federal Emergency Management Agency ("FEMA").

Appellant, a former employee of the District who managed the canal repairs, advised the District's senior management officials that he believed that the District's permanent flood control repairs were ineligible for FEMA reimbursements. The District ignored Appellant's objections, continued to solicit the FEMA reimbursements, and ultimately terminated Appellant's employment.

Thereafter, Appellant, acting as relator for the U.S. Government, brought this *qui tam* action against the District in the U.S. District Court for the Southern District of Florida.[3] Appellant alleges that the District violated the FCA by fraudulently claiming FEMA reimbursements for the ineligible canal repairs. The

---

[2] The following facts are taken from Appellant's Complaint and are accepted as true and construed in the light most favorable to Appellant for the purposes of this appeal from a Rule 12(b)(6) dismissal. *See Belanger v. Salvation Army*, 556 F.3d 1153, 1155 (11th Cir. 2009).

[3] The U.S. Government declined to intervene in this action.

3

District moved to dismiss the suit, arguing that it is an arm of the State of Florida and therefore not a "person" who could be sued under the FCA. The District Court granted the District's motion and dismissed Appellant's claim with prejudice.[4] This appeal follows.

## II

To reach its conclusion that the District constitutes an "arm and instrumentality of the State of Florida" and not a "person" within the meaning of the FCA, the District Court applied the arm of the state analysis used to determine Eleventh Amendment immunity.  Thus, the threshold question is whether the arm of the state analysis under the Eleventh Amendment parallels the personhood analysis under the FCA, an issue of first impression in this Circuit.

"The Eleventh Amendment largely shields states from suit in federal courts without their consent, leaving parties with claims against a State to present them, if the State permits, in the State's own tribunals." *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 39, 115 S. Ct. 394, 400 (1994). The Eleventh Amendment's protection extends not only to the state itself, but also to state officers and entities when they act as an "arm of the state." *Manders v. Lee*, 338 F.3d 1304, 1308 (11th Cir. 2003) (en banc). Under the traditional Eleventh Amendment paradigm, states

---

[4] The District alternatively argued that it was an arm of the State of Florida entitled to Eleventh Amendment immunity from suit. While the District Court agreed that the District was an arm of the state, it dismissed the case only on FCA grounds, declining to address the Eleventh Amendment issue.

are extended immunity, counties and similar municipal corporations are not, and entities that share characteristics of both require a case-by-case analysis. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280, 97 S. Ct. 568, 572 (1977).

By comparison, the FCA imposes liability upon "any person" who, *inter alia*, "knowingly presents, or causes to be presented, a false claim or fraudulent claim for payment." 31 U.S.C. § 3729(a). Although the FCA does not define the term "person," the U.S. Supreme Court has held that the term cannot include states or state agencies, at least for *qui tam* purposes. *See Stevens*, 529 U.S. at 780, 120 S. Ct. at 1866 (applying the Court's "longstanding interpretive presumption that 'person' does not include the sovereign"). In reaching this conclusion, the Court observed that there is a "virtual coincidence of scope" between the "statutory inquiry [into] whether States can be sued under [the FCA]" and "the Eleventh Amendment inquiry [into] whether unconsenting States can be sued [under the FCA]." *Id.* at 779–80, 120 S. Ct. at 1866. The Court subsequently held in *Cook County v. United States ex rel. Chandler* that, in contrast to states and state agencies, the term "person" under the FCA includes local governments and municipalities. 538 U.S. 119, 134, 123 S. Ct. 1239, 1249 (2003). Thus, corresponding to Eleventh Amendment immunity, *qui tam* relators can bring FCA

5

claims against local governments and municipalities, but not against states and agencies acting as arms of the state.

In light of this significant "coincidence of scope," and guided by *Stevens* and *Chandler*, we join our sister circuits in concluding that courts should employ the Eleventh Amendment arm of the state analysis to determine whether a state entity is a "person" subject to FCA liability. *See United States. ex rel. Oberg v. Ky. Higher Educ. Student Loan Corp.*, 681 F.3d 575, 579–80 (4th Cir. 2012); *Stoner v. Santa Clara Cnty. Office of Educ.*, 502 F.3d 1116, 1121–22 (9th Cir. 2007); *United States ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702, 718 (10th Cir. 2006); *United States ex rel. Adrian v. Regents of Univ. of Cal.*, 363 F.3d 398, 401–02 (5th Cir. 2004).

## III

"We review the grant of a motion to dismiss under Rule 12(b)(6)[5] for failure to state a claim de novo, accepting the allegations in the complaint as true and construing them in the light most favorable to the plaintiff." *Belanger v. Salvation Army*, 556 F.3d 1153, 1155 (11th Cir. 2009). Likewise, whether an entity constitutes an arm of the state under Eleventh Amendment immunity analysis is a question of law subject to *de novo* review. *See Abusaid v. Hillsborough Cnty. Bd.*

---

[5] Although the district court did not expressly state that it dismissed Appellant's claim under Rule 12(b)(6), bringing an FCA *qui tam* action against an entity not considered a "person" is properly considered a failure to state a claim. *See Oberg*, 681 F.3d at 578; *Stoner*, 502 F.3d at 1120.

*of Cnty. Comm'rs*, 405 F.3d 1298, 1303 (11th Cir. 2005); *Garret v. Univ. of Ala. at Birmingham Bd. of Trs.*, 344 F.3d 1288, 1290 (11th Cir. 2003) (per curium).

## IV

To determine whether an entity is acting as an "arm of the state" when carrying out a particular function, this Court looks to four factors: "(1) how state law defines the entity; (2) what degree of control the State maintains over the entity; (3) where the entity derives its funds; and (4) who is responsible for judgments against the entity." *Manders*, 338 F.3d at 1309. "[W]hether an entity is an 'arm of the State' for Eleventh Amendment purposes is ultimately a question of federal law. But the federal question can be answered only after considering provisions of state law." *Id.*

## A

As to the first factor, there is little dispute that Florida law defines the District as an arm of the State. By mandate of the Florida Constitution, the Florida Legislature must protect and conserve the State's natural resources, including its waters. *See* Fla. Const. art. II, § 7; *see also Askew v. Cross Key Waterways*, 372 So. 2d 913, 914 (Fla. 1978). Florida water management districts are creatures of statute created and defined in the Florida Water Resources Act to implement a "comprehensive statewide plan for the conservation, protection, management, and

control of state waters." *St. Johns River Water Mgmt. Dist. v. Deseret Ranches of Fla.*, 421 So. 2d 1067, 1068 (Fla. 1982) (citing Fla. Stat. § 373.016).

Structurally, the districts are designed to perform a state function—water management and protection—with regional flexibility and discretion. *See* Fla. Stat. § 373.016(5); *see also Deseret Ranches*, 421 So. 2d at 1069 (holding that the "statewide water management plan created and implemented by chapter 373 is primarily a state function serving the state's interest in protecting and managing a vital natural resource"). The State's five water management districts have boundaries drawn along hydrological lines and represent an attempt to reconcile Floridians' common, statewide interest in protecting Florida's waters with the reality that "the water resource problems of the state vary from region to region, both in magnitude and complexity." Fla. Stat. § 373.016(5).

Ultimately, the District's power to manage South Florida's waters stems solely from, and is limited by, the State; the District is not autonomous, and no county, municipality, or other local government delegates to it any authority. *Cf. Abusaid*, 405 F.3d at 1309 (observing that Florida sheriffs derive power from both the State and from counties, and they do not act as an arm of the state when enforcing county ordinances). As such, the first *Manders* factor favors the conclusion that the District is an arm of the state.

**B**

8

State control of the District, the second factor in the arm of the state analysis, is "pervasive and substantial." *Grimshaw v. S. Fla. Water Mgmt. Dist.*, 195 F. Supp. 2d 1358, 1366 (S.D. Fla. 2002) (Middlebrooks, J.). The District is governed by a board appointed by the Governor of Florida and approved by the Florida Senate. *See* Fla. Stat. § 373.073(1)(a). The Governor may remove any officer of the District. *See id.* § 373.076(2). The Executive Director of the District must be approved by the Governor and confirmed by the Florida Senate. *See id.* § 373.079(4)(a). The District budget must be submitted to the Governor, the President of the Senate, the Speaker of the House, the Secretary of the Department of Environmental Protection, and legislative chairs and subcommittees. *See id.* § 373.536(5)(d). The District's budget is subject to approval by the Governor. *See id.* § 373.536(5)(a). The Florida Land and Water Adjudicatory Commission, comprised of the Governor and his Cabinet, "[has] the exclusive authority to review any order or rule of a water management district." *Id.* § 373.114(1). In short, as Judge Middlebrooks noted in *Grimshaw*, "[t]he degree of state control exercised over [t]he South Florida Water Management District] is very compelling." 195 F. Supp. 2d at 1366.

Of course, the amount of general control exercised over the District may vary depending upon the "particular function in which the defendant was engaged when taking the actions out of which liability is asserted to arise." *Manders*, 338

9

F.3d at 1308. Here, the District and Appellant disagree on how the particular function at issue in this case should be articulated. Specifically, the actions giving rise to the District's asserted FCA liability were its allegedly fraudulent requests for FEMA reimbursements. The District contends that, because the reimbursements were tied directly to necessary canal repairs, the function at issue is the District's core mission of water management. Therefore, because the State maintains substantial control over the District's water management operations, the District argues that it was acting as an arm of the state when it made the reimbursement requests. According to Appellant, however, the function at issue is much narrower: the solicitation of public grants. Thus, because the statute that authorizes the District to solicit public grants does not require direct State oversight, *see* Fla. Stat. § 373.083(4), Appellant argues that the District was acting with autonomy akin to that of a county or municipality when it requested the FEMA reimbursements and therefore was not functioning as an arm of the state.

This abstraction argument strays from the "key question" of the *Manders* function-by-function inquiry, which "is not what . . . powers [state entities] have, but *for whom* [they] exercise that power." *Abusaid*, 405 F.3d at 1310 (quoting *Manders*, 338 F.3d at 1319 n.35) (internal quotation marks omitted). Whether the function at issue is articulated as water management operations or the solicitation of public grants, the District derives both the authority and the obligation to

exercise those powers directly from the State.[6] *See id.* at 1304 n.4 (looking to the sources of an entity's authority to take a particular action and its duty to do so when considering the first two prongs of the *Manders* inquiry); *see also* Fla. Stat. § 373.083(4) (authorizing the District to solicit and accept public grants only for District projects); Fla. Stat. § 373.036(2)(a) (requiring water management districts to maintain flood protection plans). That the District maintains some degree of autonomy over its day-to-day operations does not change the fact that the State of Florida ultimately retains near-total control over it. *See Fouche v. Jekyll Island-State Park Auth.*, 713 F.2d 1518, 1521 (11th Cir. 1983) (reasoning that a state park's authority to operate profit-making enterprises did not alter its status as an arm of the state where the state controlled the park's use of its profits). Accordingly, the state-control factor weighs heavily in favor of the conclusion that the District is an arm of the State of Florida.

## C

---

[6] Moreover, the cases to which Appellant cites to support his narrow characterization of the function at issue all involve defendants that derive power from, and are controlled by, multiple entities. *See Abusaid*, 405 F.3d at 1303–14 (addressing Florida sheriffs, who derive power from both the State and counties); *Keene v. Prine*, 477 F. App'x 575, 578 (11th Cir. 2012) (involving Georgia sheriffs subject to state and county control); *Rosario v. Am. Corrective Counseling Servs., Inc.*, 506 F.3d 1039, 1044–45 (11th Cir. 2007) (concerning independent contractors subject to partial state control but retaining substantial autonomy). By contrast, the District answers only to the State and is not independently autonomous. Distillation of the function to its most ministerial conception does not alter that fact.

Appellant urges the third *Manders* factor—the source of the District's funding—weighs strongly in favor of the District's autonomy and compels reversal. We disagree. While it is true that water management districts are empowered to levy ad valorem taxes, issue bonds, buy land, and borrow money, *see* Fla. Const. art. VII, § 9, it is equally clear that the State of Florida provides a significant, albeit fluctuating,[7] portion of the District's funding, as well. The funding mechanism established by the Florida Legislature seeks to harmonize the regional impact of water management district projects on the State's natural resources with the fact that preservation and management of these resources is crucial to all residents, not just those who are affected locally. *See* Fla. Stat. § 373.503(1) (establishing blended state and local financing for water management districts based on the legislative finding that they provide both state and regional benefits). Thus, this funding mechanism does not create such autonomy in the District so as to render it a "person" within the meaning of the FCA, nor does it strip the District of its insulation from suit in a federal forum. *See Williams v. Dist. Bd. of Trs. of Edison Cmty. Coll.*, 421 F.3d 1190, 1194 (11th Cir. 2005) (per curium) (finding that the mixed state and local funding mechanism

---

[7] Appellant alleges that, by the 2009–2010 fiscal year, state appropriations accounted for only 11% of the District's funding. *Cf. Grimshaw*, 195 F. Supp. 2d at 1366–67 (finding that, "[w]hile it varies from year to year because of large acquisitions, [in 2002] state funding [accounted for] between 20 to 30 percent of [the South Florida Water Management District's annual budget]").

requiring state budget approval weighed in favor of concluding that Florida community colleges are arms of the State).

## D

As to the fourth factor, which concerns whether the State bears the ultimate responsibility for adverse judgments against an entity, Appellant argues that he would look only to the District to satisfy any money judgment that might result from this action. Furthermore, Appellant contends that the District's creation of a self-insurance fund ensures that only the District, and not the State of Florida, would be liable for adverse judgments. In so arguing, Appellant joins a long line of litigants who have sought "to detach the importance of a State's legal liability for judgments against a state agency from its moorings as an indicator of the relationship between the State and its creation and to convert the inquiry into a formalistic question of ultimate financial liability." *Regents of Univ. of Cal. v. Doe*, 519 U.S. 425, 430–31, 117 S. Ct. 900, 904–05 (1997). However, "it is the entity's potential legal liability, rather than its ability or inability to require a third party to reimburse it, or to discharge the liability in the first instance, that is relevant." *Id.* at 431, 117 S. Ct. at 904 (holding that a state university was entitled to Eleventh Amendment immunity despite the fact that the federal government had agreed to fully indemnify the university against the cost of litigation, including adverse

judgments). Accordingly, the presence or absence of a self-insurance fund is not determinative of the District's status as an arm of the state.

Moreover, this argument digresses from the real funding issue: Should judgment creditors deplete the District's funds to the point that it can no longer effectively function, the State would ultimately have to choose between increasing its appropriation to make up the shortfall or shirking its constitutionally mandated duty to "conserve and protect [the State's] natural resources and scenic beauty." Fla. Const. art. II, § 7(a). Ultimately then, "while a judgment is legally enforceable against the district . . . [t]he state's treasury is directly implicated." *Grimshaw*, 195 F. Supp. 2d at 1369. The fourth *Manders* factor therefore favors concluding that the District constitutes an arm of the State.

**\*\*\***

In summary, we hold for the reasons expressed herein that the South Florida Water Management District is an arm of the State of Florida under the Eleventh Amendment immunity analysis—and therefore not a "person" for purposes of FCA *qui tam* liability.

**IV**

Our opinion today, which applies the Eleventh Amendment's arm of the state analysis to this FCA *qui tam* action, touches on a curious quirk in our system of dual sovereignty: an analysis borrowed from an Amendment designed to protect

14

state coffers from private citizens[8] compels the conclusion that private citizens cannot protect federal coffers from deceitful states. Curiosities aside, the result in this case is clear: we hold that, as an arm of the State of Florida, the South Florida Water Management District is not a "person" that can be subjected to suit by a *qui tam* relator under the False Claims Act.[9]

AFFIRMED.

---

[8] In 1795, the United States adopted the Eleventh Amendment largely in response to the States' fears that federal courts would require them to repay their Revolutionary War debts to private, individual creditors, which could have led to their financial ruin. *See Hess*, 513 U.S. at 39, 115 S. Ct. at 400; *Petty v. Tenn.-Mo. Bridge Comm'n*, 359 U.S. 275, 276 n.1, 79 S. Ct. 785, 787 n.1 (1959).

[9] Having held in this case that the South Florida Water Management District is an arm of the State of Florida and that it is therefore not a person subject to FCA *qui tam* actions, we decline, as did the district court, to reach the question of whether the District is entitled to Eleventh Amendment immunity from suit in federal court. *See Stevens*, 529 U.S. at 779–80, 120 S. Ct. at 1866 (determining that the statutory question of whether a state agency can be sued by an individual FCA relator should be addressed prior to the Eleventh Amendment immunity question of whether the state agency is immune from suit in the federal forum). We note, however, that the analysis for the two questions is identical.