[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-14409

_____

TAQUILA MONROE,

Plaintiff-Appellant,

*versus*

FORT VALLEY STATE UNIVERSITY,

Defendant,

BOARD OF REGENTS OF THE UNIVERSITY
SYSTEM OF GEORGIA,

Defendant-Appellee

_____

Appeal from the United States District Court
for the Middle District of Georgia
D.C. Docket No. 5:21-cv-00089-MTT

_____

Before BRANCH, BRASHER, and ED CARNES, Circuit Judges.

ED CARNES, Circuit Judge:

This appeal requires us to determine whether Congress abrogated sovereign immunity for lawsuits against States under the anti-retaliation provision of the False Claims Act (FCA), 31 U.S.C. § 3730(h).  And whether the Board of Regents of the University System of Georgia is an arm of the State entitled to the same immunity the State would have.  Because Congress didn't abrogate sovereign immunity under that provision, and the Board is an arm of the State, the district court correctly granted the Board's motion to dismiss the plaintiff's complaint.

**I.**

Taquila Monroe was hired in August 2020 to serve as the Program Director for Fort Valley State University's Head Start and Early Head Start department, and she reported to the executive director of that department.[1]  About five months after she was hired, Monroe was terminated.  She filed a lawsuit against the Board,

---

[1] Head Start is a federal program designed "to promote the school readiness of low-income children by enhancing their cognitive, social, and emotional development." 42 U.S.C. § 9831.

asserting claims under the Georgia Whistleblower Act, Ga. Code Ann. § 45-1-4, and the FCA's anti-retaliation provision, 31 U.S.C. § 3730(h)(1).[2]

Monroe's amended complaint (the operative one) alleges that Fort Valley receives millions of dollars annually from the U.S. Department of Health and Human Services to fund Early Head Start services for children up to the age of three and Head Start services for children ages three to five.[3]  The university's Head Start programs are also "partly supported by matching funds from the State of Georgia."  Fort Valley uses those federal and state monies to deliver resources and services to local providers.  Those local providers are called "subrecipients," and they run Head Start programs in their communities.

Monroe alleges that she "discovered pervasive, systematic problems in the structure of" Fort Valley's Head Start programs and that her attempts to "implement reforms" were "rebuffed" by her boss, the executive director of the programs.  She asserts that

---

[2] Monroe initially sued both Fort Valley and the Board, but the district court dismissed Fort Valley because a member institution of the State of Georgia's university system "is not a separate or distinct legal entity from the Board and, therefore, cannot sue or be sued in its own capacity."  *See Bd. of Regents of the Univ. Sys. of Ga. v. Doe*, 630 S.E.2d 85, 87 (Ga. Ct. App. 2006).  Monroe does not challenge that decision, and Fort Valley is not a party to this appeal.

[3] When reviewing the grant of a motion to dismiss, we take the factual allegations in the complaint as true and construe them in the light most favorable to the plaintiff.  *See Edwards v. Prime, Inc.*, 602 F.3d 1276, 1291 (11th Cir. 2010).

Fort Valley misallocates Head Start funds and mismanages the Head Start programs in ways that make them non-compliant with federal standards.  Monroe specifically alleges that Fort Valley has been guilty of: overspending on the costs of "developing and administering" Head Start grants; allocating Head Start funds to an employee primarily engaged in unrelated projects; using grant funds to pay down debts; improperly serving as both a grantee of the programs and a subrecipient of their benefits; excluding the Head Start policy council (comprised of parents and community leaders) from program decision-making; disregarding qualification requirements for subrecipients' teachers; and refusing to implement required protocols for monitoring subrecipient performance.

Monroe claims that she was fired because she reported those alleged improprieties to the executive director.  Fort Valley sent Monroe a termination letter stating that her actions "were not properly vetted to ensure that the Head Start and Early Head Start programs [were] continuing to operate within the established [Fort Valley] system."

Monroe filed suit under state law and the FCA's anti-retaliation provision, which provides relief to an employee discharged because of efforts to stop the presentment of false claims to the federal government.  *See* 31 U.S.C. § 3730(h).  The Board filed a motion to dismiss her complaint.  The district court decided that the FCA's anti-retaliation provision permits lawsuits against States.  But the court also decided that Congress did not unequivocally abrogate the Eleventh Amendment sovereign immunity of States

from suits brought under that provision. Finally, the court decided that because the Board of Regents is an arm of the State, the Eleventh Amendment shields it from liability on Monroe's FCA and Georgia Whistleblower Act claims. We agree.

## II.

Whether the Georgia Board of Regents is an entity that can be sued under the anti-retaliation provision of the FCA is a matter of statutory interpretation. Whether the Board has sovereign immunity from Monroe's lawsuit is a jurisdictional matter. The district court ruled on both issues.

We are generally required to address jurisdiction as a threshold issue before reaching the merits of a case. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93–102 (1998) (rejecting view that courts may decline to address questions of jurisdiction and proceed to more easily resolvable questions of merits); *Gardner v. Mutz*, 962 F.3d 1329, 1339 (11th Cir. 2020) ("[T]he Supreme Court has expressly condemned the exercise of a so-called '"hypothetical jurisdiction" that enables a court to resolve contested questions of law when its jurisdiction is in doubt."') (quoting *Steel Co.*, 523 U.S. at 101). But the Supreme Court has said that there are circumstances in which it is "possible, and indeed appropriate, to decide the statutory issue" of whether a party is subject to suit under a statute before deciding the jurisdictional issue of sovereign immunity. *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 780 (2000). For reasons we will explain, it is unnecessary for us to

decide in this case the answer to the first issue, the statutory inter-pretation one.

The district court decided as a matter of statutory interpre-tation that the FCA's anti-retaliation provision allows for suit against the Board. The Board has not challenged that decision be-fore us. It didn't raise the issue in its brief. The Board's counsel acknowledged that it could prevail in the appeal by winning on ei-ther of the two issues but the clearest way was with the Eleventh Amendment non-abrogation issue. By failing to raise the statutory issue before this Court, the Board has, for purposes of this appeal, "abandoned any argument" that it is not subject to suit under the terms of the anti-retaliation provision of the FCA. *Sapuppo v. All-state Floridian Ins. Co.*, 739 F.3d 678, 680 (11th Cir. 2014); *see In re Blue Cross Blue Shield Antitrust Litig. MDL 2406*, 85 F.4th 1070, 1092 (11th Cir. 2023) ("We will not consider issues that a party fails to brief adequately."); *Regions Bank v. Legal Outsource PA*, 936 F.3d 1184, 1189 (11th Cir. 2019) ("[The defendants] have failed to argue or cite caselaw [in support of a position . . .], so we consider that issue abandoned."); *United States v. Willis*, 649 F.3d 1248, 1254 (11th Cir. 2011) ("A party seeking to raise a claim or issue on appeal must plainly and prominently so indicate. . . . Where a party fails to abide by this simple requirement, he has waived his right to have the court consider that argument.") (alteration adopted) (quotation marks omitted); *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1330 (11th Cir. 2004) ("Any issue that an appellant wants the Court to address should be specifically and clearly identified in the brief. .

21-14409                Opinion of the Court                7

. . Otherwise, the issue — even if properly preserved at trial — will be considered abandoned. . . .") (quotation marks omitted).

We do not express or imply any view on whether the FCA's anti-retaliation provision provides a private cause of action against a state agency in the circumstances of this case. We do hold that the Board has forfeited that issue by not raising it before us. We turn to the Eleventh Amendment sovereign immunity issue, which the parties have raised and argued to us.

### III.

The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. It "largely shields states from suit in federal courts without their consent, leaving parties with claims against a State to present them, if the State permits, in the State's own tribunals." *United States ex rel. Lesinski v. S. Fla. Water Mgmt. Dist.*, 739 F.3d 598, 601 (11th Cir. 2014) (quotation marks omitted). But Eleventh Amendment immunity doesn't apply, even to unconsenting States, if Congress has abrogated the immunity pursuant to a valid exercise of its power. *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 55 (1996).

"To temper Congress' acknowledged powers of abrogation with due concern for the Eleventh Amendment's role as an essential component of our constitutional structure," the Supreme Court has "applied a simple but stringent test: Congress may

abrogate the States' constitutionally secured immunity from suit in federal court only by making its intention unmistakably clear in the language of the statute." *Dellmuth v. Muth*, 491 U.S. 223, 227–28 (1989) (quotation marks omitted). Because it is "incumbent upon the federal courts to be certain of Congress' intent before finding that federal law overrides the guarantees of the Eleventh Amendment," Congress must "unequivocally express this intention in the statutory language." *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 243 (1985), *superseded by statute on other grounds*, Rehabilitation Act Amendments of 1986, Pub. L. No. 99-506, § 1003, 100 Stat. 1807, 1845. Which is to say, if Congress "chooses to subject the States to federal jurisdiction, it must do so specifically," because "[a] general authorization for suit in federal court is not the kind of unequivocal statutory language sufficient to abrogate the Eleventh Amendment." *Id.* at 246; *see Seminole Tribe of Fla. v. Florida*, 11 F.3d 1016, 1024 (11th Cir. 1994), *aff'd*, 517 U.S. 44 (1996). Authorizing a lawsuit generally is not tantamount to specifically authorizing a lawsuit against a State in federal court.

Monroe contends that the FCA's anti-retaliation provision, 31 U.S.C. § 3730(h)(1), contains an unequivocal abrogation of sovereign immunity. This is what that provision says:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment

> because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

31 U.S.C. § 3730(h)(1).

There is no "unmistakably clear" abrogation of State sovereign immunity here. *Dellmuth*, 491 U.S. at 228 (quotation marks omitted). Like the statute at issue in *Dellmuth*, the FCA's anti-retaliation provision does not mention the Eleventh Amendment. It does not mention the States. It does not mention abrogation. And it does not mention who may be sued for violating it. *See id.* at 231 (concluding that a statute did not abrogate sovereign immunity because it included "no reference whatsoever to either the Eleventh Amendment or the States' sovereign immunity," did not "address abrogation in even oblique terms," and did not "speak to what parties are subject to suit"). The FCA's anti-retaliation provision allows "[a]ny employee, contractor, or agent" to seek relief in federal court, but it doesn't say that a State may be ordered to provide that relief. 31 U.S.C. § 3730(h)(1). Instead, the provision provides only "[a] general authorization for suit in federal court." *Dellmuth*, 491 U.S. at 231 (quotation marks omitted); *see also Atascadero*, 473 U.S. at 245–46 (concluding that the statute allowing for recovery against "any recipient of Federal assistance" did not abrogate sovereign immunity though it was undisputed that the defendant State fit into that category) (quoting 29 U.S.C. § 794a(a)(2)). The FCA's anti-retaliation provision falls short of an unequivocal expression of intent to subject States to suit. *See Atascadero*, 473 U.S. at 243.

Faced with the absence of statutory language to support her position, Monroe invents language as she walks us through amendments to the statute. The previous version of the anti-retaliation provision enacted in 1986 stated in relevant part:

> Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment *by his or her employer* because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole.

31 U.S.C. § 3730(h) (1986) (emphasis added); *see also* False Claims Amendments Act of 1986, Pub. L. No. 99-562, § 4, 100 Stat. 3153, 3157–58. Monroe points out that in 2009 Congress amended the statute to remove the words "by his or her employer." *See* 31 U.S.C. § 3730(h)(1); Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21, § 4(d), 123 Stat. 1617, 1624–25. She also considers it significant that, in the wake of the Supreme Court's 2000 holding in *Vermont Agency* that the definition of "person" in the *qui tam* liability provision of the FCA does not encompass the sovereign, *see* 529 U.S. at 780–87, Congress elected not to include "person" in the revised version of § 3730(h). In Monroe's view, we can infer an intent to allow suits against States from Congress' removal of the words "his or her employer" and failure to replace them with the

word "person," which the Supreme Court had established was insufficient to abrogate sovereign immunity.

That's not how Eleventh Amendment abrogation works. Inferences aren't enough. Our basis for finding an abrogation must be "textual," *Dellmuth*, 491 U.S. at 230, "specific[]," *Atascadero*, 473 U.S. at 246, and grounded "only [in] the clearest indications" from Congress, *id.* at 243. Not implied, general, and ambiguous. Monroe cites no case (and we have found none) where a court held that Congress abrogated sovereign immunity merely by omitting a word that isn't sufficient to abrogate immunity without adding words that are sufficient.

The non-vacated decisions she cites where Congress abrogated the Eleventh Amendment's protections — including cases where courts considered amendments to the statutes at issue — are easily distinguishable based on the statutes' use of the term "State" or terms synonymous with States or state entities. *See Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 68, 73–74 (2000) (concluding that Age Discrimination in Employment Act, 29 U.S.C. § 621, abrogated sovereign immunity where it incorporated by reference a statute amended to permit actions "against any employer (including a public agency)") (quoting 29 U.S.C. § 216(b)); *Seminole Tribe*, 517 U.S. at 57 (concluding that "numerous references to the 'State' in the text of § 2710(d)(7)(B) ma[d]e it indubitable that Congress intended through the Act to abrogate the States' sovereign immunity"); *A.W. v. Jersey City Pub. Schs.*, 341 F.3d 234, 238, 242–50 (3d Cir. 2003) (concluding that "Congress unequivocally expressed its intent to

condition participation in . . . two federal assistance programs on the state's relinquishment of its immunity" where statutes explicitly stated that State would not be immune under the Eleventh Amendment for violations of those statutes); *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363–64 (2001) (finding clear statement of intent to abrogate where statute explicitly stated that "[a] State shall not be immune under the eleventh amendment . . . for a violation of this chapter") (quoting 42 U.S.C. § 12202).  Nothing like that language appears in the anti-retaliation provision of the FCA.

We are not alone in concluding that the anti-retaliation provision of the FCA doesn't abrogate sovereign immunity.  Every circuit that has addressed the issue in a published opinion has held that the previous version of 31 U.S.C. § 3730(h) (the one that included the word "employer") did not abrogate sovereign immunity.  *See Wood ex rel. United States v. Am. Inst. in Taiwan*, 286 F.3d 526, 535 (D.C. Cir. 2002) (concluding that a government entity "enjoy[ed] sovereign immunity" in suit under § 3730(h)); *United States v. Tex. Tech Univ.*, 171 F.3d 279, 294–95 (5th Cir. 1999) (concluding that a suit against State defendants under § 3730(h) "must be dismissed" due to "Eleventh Amendment implications"); *LeBlanc v. United States*, 50 F.3d 1025, 1028–30 (Fed. Cir. 1995) (concluding that sovereign immunity applied where the plaintiff "ha[d] not directed us to any statutory language that even hints that Congress intended to subject the federal government to suit under section 3730(h)").  Those holdings remain persuasive following Congress' modification of the language in § 3730(h) because, as we have explained, the post-amendment version of the provision gives no

more indication that States are subject to suit than the pre-amendment version did.

Because Congress did not abrogate sovereign immunity for suit under 31 U.S.C. § 3730(h)(1) with unmistakable clarity, *see Dellmuth*, 491 U.S. at 228, state entities may invoke the Eleventh Amendment to defend against FCA anti-retaliation suits.

## IV.

Having determined that Congress did not abrogate state sovereign immunity under 31 U.S.C. § 3730(h)(1), we turn now to the issue of whether the Georgia Board of Regents is entitled to it. An entity is protected by a State's Eleventh Amendment immunity if it is an arm of the State. *See Lesinski*, 739 F.3d at 602. The Board insists it is that. Monroe says the Board isn't that.

We have held the Georgia Board of Regents is an arm of the State entitled to sovereign immunity. *See Barnes v. Zaccari*, 669 F.3d 1295, 1298, 1308–09 (11th Cir. 2012) (reversing denial of summary judgment to Board on sovereign immunity grounds and stating: "The Board is an arm of the State of Georgia."); *Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1301–02 (11th Cir. 2007) (holding that "the Eleventh Amendment bar[red] suit against" the Board, which is a "state entit[y] for Eleventh Amendment purposes"); *see also Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 620 (2002) (concluding that "the State" (i.e., the Board) had waived Eleventh Amendment immunity by removing case to federal court); *Stroud v. McIntosh*, 722 F.3d 1294, 1299 (11th Cir. 2013) (explaining that in *Lapides*, "[a] university professor sued the Board

of Regents of the University System of Georgia (an arm of the state)").

Monroe contends that, notwithstanding that precedent, we must apply our usual arm-of-the-State test to determine if the Board was acting as a sovereign instrumentality when it performed (through Fort Valley) the particular functions at issue in this case. But nothing about Fort Valley's administration of the Head Start and Early Head Start programs changes the Board's status as an arm of the State of Georgia.

This Court considers four factors to determine whether an entity is an arm of the State entitled to Eleventh Amendment immunity: "(1) how state law defines the entity; (2) what degree of control the State maintains over the entity; (3) where the entity derives its funds; and (4) who is responsible for judgments against the entity." *Manders v. Lee*, 338 F.3d 1304, 1309 (11th Cir. 2003) (en banc). We begin with the two factors we have identified as most important: how state law defines the entity, *see Versiglio v. Bd. of Dental Exam'rs of Ala.*, 686 F.3d 1290, 1292 (11th Cir. 2012), and who is responsible for judgments against it, *see Freyre v. Chronister*, 910 F.3d 1371, 1384 & n.13 (11th Cir. 2018); *Rosario v. Am. Corrective Counseling Servs., Inc.*, 506 F.3d 1039, 1046 (11th Cir. 2007).

A.  How State Law Defines the Entity

The way that state law defines the Board is important in determining its arm-of-State status. That's "because states have extremely wide latitude in determining their forms of government

and how state functions are performed." *Manders*, 338 F.3d at 1309 n.10.

In *Versiglio* we held that a dental examiners board was an arm of the State of Alabama entitled to Eleventh Amendment immunity. 686 F.3d at 1292–93. That decision relied on the Alabama Supreme Court's determination the board was entitled to sovereign immunity under the state constitution. *Id.* Observing that "[t]his court gives great deference to how state courts characterize the entity in question," we declined to reach a conclusion "diametrically opposed to the findings of the highest state court to consider the issue." *Id.*; *see also McAdams v. Jefferson Cnty. 911 Emergency Commc'ns. Dist.*, 931 F.3d 1132, 1134–35 (11th Cir. 2019) (rejecting sovereign immunity defense and relying on state supreme court decision that entity analogous to defendant was not "agency of the state"); *Walker v. Jefferson Cnty. Bd. of Educ.*, 771 F.3d 748, 755–56 (11th Cir. 2014) (relying on Alabama Supreme Court holding that local school boards were not arms of the State with respect to employment decisions to reach same conclusion).

Monroe concedes that "the Board and its affiliates are state created entities." The Board was created by the Georgia Constitution and holds constitutional and statutory mandates to manage the university system of the State of Georgia. *See* Ga. Const. art. VIII, § 4 ¶ I(b); Ga. Code Ann. § 20-3-51. Under the Georgia Constitution, "[i]t is settled that the Board is an agency of the State to which sovereign immunity applies." *Olvera v. Univ. Sys. of Ga.'s Bd.*

*of Regents*, 782 S.E.2d 436, 437 (Ga. 2016); *see Versiglio*, 686 F.3d at 1292–93.

Monroe argues that a "federally backed [Head Start/ Early Head Start] program" is not a state entity under state law. But she did not sue a federally backed "program." She sued the Board, which Georgia treats as a state entity entitled to sovereign immunity. This factor strongly favors treating the Board as an arm of the State.

### B.  Who Is Responsible for a Judgment Against the Board

"[W]hen the action is in essence one for the recovery of money from the state, the state is the real, substantial party in interest and is entitled to invoke its sovereign immunity from suit . . . ." *Regents of Univ. of Cal. v. Doe,* 519 U.S. 425, 429 (1997); *see also Williams v. Dist. Bd. of Trs. of Edison Cmty. Coll.*, 421 F.3d 1190, 1194 (11th Cir. 2005) (concluding that a community college was arm of the State where "the state [was] ultimately responsible for [its] liabilities"). This factor weighs in favor of applying sovereign immunity when "the state's treasury is directly implicated." *Lesinski*, 739 F.3d at 605 (alterations adopted) (quotation marks omitted); *see also Shands Teaching Hosp. & Clinics, Inc. v. Beech St. Corp.*, 208 F.3d 1308, 1313 (11th Cir. 2000) (concluding that a third party administrator of state health care services program was state entity where a judgment against it "would implicate state funds").

The Board insists that no entity other than the State of Georgia could be held liable for a judgment against the state agency that is constitutionally and statutorily responsible for managing

Georgia's university system.  Monroe admits that the Board "gets some traction" on this argument.  More accurately, with this argument the Board is on solid ground.  It is the only remaining defendant in this suit.  Its funding derives from the state legislature.  *See* Ga. Const. art. VIII, § 4 ¶ I(c).  And a judgment would have to be paid out of State funds.

Monroe asserts that discovery is appropriate to determine whether the Board has liability coverage to protect against adverse judgments.  But the availability of liability insurance does not make the Board less of a state entity for sovereign immunity purposes.  The Supreme Court has rejected the argument that a State's purchase of insurance to protect itself from liability diminishes its claim to sovereign immunity, explaining: "[I]t is the entity's potential legal liability, rather than its ability or inability to require a third party to reimburse it, or to discharge the liability in the first instance, that is relevant."  *See Regents of Univ. of Cal.,* 519 U.S. at 431; *see also Lesinski*, 739 F.3d at 605 (rejecting argument that existence of self-insurance fund ensuring that defendant entity and not the State would be liable for a judgment was "determinative of the [entity's] status as an arm of the state").

The State of Georgia is responsible for judgments against the Board of Regents, and state law defines it as an arm of the State.  Thus, the two most important factors favor immunity.  We now turn to the remaining two factors: the degree of control the State exercises over the Board and the Board's source of funding.

C. <u>Degree of State Control</u>

The degree of control that Georgia exercises over the Board "must be assessed in light of the particular function in which the [Board] was engaged when taking the actions out of which liability is asserted to arise." *Manders*, 338 F.3d at 1308; *see also Lesinski*, 739 F.3d at 603.

Monroe and the Board disagree on how to define the Board's "particular function[s]" in the context of this case. *See Manders*, 338 F.3d at 1308. Monroe encourages us to define the Board's relevant functions narrowly, focusing on Fort Valley's administration of the Head Start and Early Head Start programs. While acknowledging that the Board is an arm of the State in other capacities, she contends that the State maintains minimal control over the administration of the Head Start programs. She argues that the programs are federally regulated and that their administration "derives from federal (not State) policy." The Board, by contrast, defines its relevant function more generally by pointing to its constitutional mandate to govern the State's university system.

*Lesinski* featured a similar dispute on comparable facts: a state-created entity sought federal funds from a federal program, which led to a lawsuit under the FCA. 739 F.3d at 600–01. The state entity in that case was a Florida water management district that had requested reimbursement from the Federal Emergency Management Agency for post-hurricane repairs. *Id.* We concluded that the district was an arm of the State that was immune from an FCA action challenging its solicitation of those federal funds. *Id.* at

600.[4]  The parties disagreed on how to articulate the "particular function at issue" when debating the state-control factor: either the district's solicitation of public grants specifically, or its mission of water management generally.  739 F.3d at 603.  We declined to endorse either position and explained that the parties' "abstraction argument stray[ed] from the 'key question' of the *Manders* function-by-function inquiry, which is not what powers state entities have, but *for whom* they exercise that power.'"  *Id.* at 604 (alterations adopted) (quotation marks omitted).  In *Lesinski* the state-control factor favored immunity because, however its applicable powers were defined, "the District derive[d] both the authority and the obligation to exercise those powers directly from the State."  *Id.*

The answer to that "key question" in *Lesinski* compels us to conclude here that the Board is acting for the State of Georgia. When the Board procures and uses federal grant money to help Georgia children, it is exercising a welfare power on behalf of the State.  In administering the Head Start programs, the Board may be acting in part on behalf of the federal government, but only in part.

Not only that, but the administrators of Fort Valley made an official decision to participate in those federal programs.  Those decisionmakers were elected or appointed by the Board, *see* Ga. Code

---

[4] *Lesinski* was interpreting 31 U.S.C. § 3729(a) of the FCA instead of considering the applicability of sovereign immunity, but it used the same arm-of-the-State analysis applicable to the Eleventh Amendment.  *See* 739 F.3d at 601–02 (citing *Vermont Agency*, 529 U.S. at 779–80).

Ann. § 20-3-31(2), which is comprised of members from across the State of Georgia who were appointed by its governor and confirmed by its senate, Ga. Const. art. VIII, § 4 ¶ I(a); Ga. Code Ann. § 20-3-21; *see also Manders*, 338 F.3d at 1319 n.35 (noting that when "the State delegates and performs certain . . . functions through" an entity, that entity "act[s] for and represent[s] the State in those assigned tasks"). And participation in the Head Start programs is entirely consistent with the Board's core state duties, which include "establish[ing] all such schools of learning or art as may be useful to the state and . . . organiz[ing] them in the way most likely to attain the ends desired." Ga. Code Ann. § 20-3-31(3).

The State exercises sufficient control over the university system, including the employees at Fort Valley applying for federal grants to help Georgia's children, to weigh this factor in favor of sovereign immunity. *See Lesinski*, 739 F.3d at 603–04; *Williams*, 421 F.3d at 1193 (concluding that a state community college was entitled to sovereign immunity in a suit based on an alleged violation of students' privacy rights due to sending grades by email where the State of Florida "maintain[ed] substantial control over its educational system, including community colleges").[5]

---

[5] Monroe urges a narrow definition of the Board's relevant functions, but the decisions she relies on feature an entirely different issue: whether an entity or official is more like a State, which is entitled to sovereign immunity, or more like a county or similar municipal entity, which is not. *See Freyre*, 910 F.3d at 1380 (explaining that a law enforcement officer "is entitled to Eleventh Amendment immunity if he is acting as an arm of the state but not if he is acting as an arm of the county") (quotation marks omitted); *Abusaid v.*

21-14409                Opinion of the Court                21

### D. Where Entity Derives its Funds

If "state funds are involved to some extent in the particular functions . . . at issue," that is "sufficient to tilt the [source of funds] factor of the Eleventh Amendment analysis toward immunity" even if some other entity "bears the major burden of funding." *Manders*, 338 F.3d at 1323–24; *see also Lesinski*, 739 F.3d at 604–05 (concluding that water management district was not "strip[ped] . . . of its insulation from suit in a federal forum" where the State "provide[d] a significant, albeit fluctuating, portion of the District's funding") (footnote omitted); *Williams*, 421 F.3d at 1194 (concluding that community college was arm of the State, explaining that "[a]lthough [it was] not exclusively funded by the state, state approval of institutional budgets evidences state control").

---

*Hillsborough Cnty. Bd. of Cnty. Comm'rs*, 405 F.3d 1298, 1317 (11th Cir. 2005) (concluding that sheriff was not acting as an arm of State when enforcing county ordinance); *Manders*, 338 F.3d at 1318–29 (comparing roles of State and county in the function at issue and concluding that sheriff was "an arm of the State, not [the] County,"); *see also McAdams*, 931 F.3d at 1135–36 (concluding that a county's 911 emergency communications district was not an arm of State entitled to sovereign immunity).

These cases have little, if any, persuasive value on the question of how to define the Board's function here. Monroe does not argue that the Board is like a county or other political subdivision, and her allegation that Fort Valley operated the Head Start programs in eight different Georgia counties would refute that characterization anyway. Instead, Monroe focuses on the Board's participation in federal programs. But as we have discussed, *see infra* Part IV.C, even when it accepts federal funds, the Board is acting on behalf of the State of Georgia.

Although Monroe emphasizes the federal funding of Head Start programs, her own amended complaint alleges that the Head Start grant "is partly supported by matching funds from the State of Georgia." By law, it must be; the federal government cannot provide more than eighty percent of the costs. *See* 42 U.S.C. § 9835(b). And the Board itself is funded by appropriations from the Georgia legislature. Ga. Const. art. VIII, § 4, ¶ I(c); Ga. Code Ann. § 20-3-53. The involvement of state funds in the function at issue pushes this factor onto the side of sovereign immunity. *See Manders*, 338 F.3d at 1323–24; *Lesinski*, 739 F.3d at 604–05; *Williams*, 421 F.3d at 1194.[6]

Individually and collectively, the *Manders* factors weigh heavily in favor of treating the Georgia Board of Regents as an arm

---

[6] Monroe relies on out-of-circuit decisions in which self-funded organizations that engaged in commercial activity were found not to be arms of the State. *See United States ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 804 F.3d 646, 650, 658, 669, 676 (4th Cir. 2015) (concluding that a provider of student aid services established by the State of Pennsylvania was not an arm of State where it "support[ed] itself" through "significant revenues generated by its extensive commercial activities"); *United States ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702, 718–19, 721 (10th Cir. 2006) (concluding that an organization of pathologists owned by a corporation that was itself owned by a state university was not an arm of State of Utah where it "was designed to be not only self-sustaining, but a commercial 'profit center'"), *abrogated on other grounds by Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 587 U.S. ----, 139 S. Ct. 1507 (2019). Those two decisions have little bearing on the question of whether the Board, which relies on some funding from the State of Georgia to provide non-profit educational services, is an arm of the State for purposes of this lawsuit.

of the State for Eleventh Amendment purposes. Consistent with our precedent, we hold that the Board is entitled to sovereign immunity.

**AFFIRMED.**